Who argues first here? Good afternoon, your honors. Donald Nixon for Mr. Ayala. And if it pleases the court, my co-counsel, Mr. Stone, has graciously said that I may have 12 of our 20 minutes. You better stop when you're done with 12. I promise. We've got a clock here that runs on 20. I will actually hope to stop. If you go further, he'll take it out of your hide later.  All right. May it please the court, I've done this long enough to know that a lawyer should proceed cautiously when you're interpreting a case in the presence of its author. That said, however, I believe that the question this panel faces in this case is not whether to remand. I think that under the authority of the Perez-Lopez case that I cited in my 28-J letter and provided to the government, because the district court considered an erroneous view of the record, considered a fact which, insofar as the briefing displays, I think is conceded by the government, he considered a mistake of fact in his totality of the circumstances analysis under Schneckloff v. Bustamante. And under Perez-Lopez, when the district court does that, this court must at a minimum remand the case for reconsideration of the validity of the consent in view of an accurate picture of the record. Indeed, this case, I would submit, is even more so than Perez-Lopez. In Perez-Lopez, there was an interpreter. And the question that this court considered is whether the district court's analysis of the question of voluntariness of consent was accurately performed. However, here, Judge Hogan's opinion considers, first, the question of whether there was knowing consent at all. And that is because there was no interpreter present at the scene of this search. And the only way that consent could have been given, if it were given at all, is in writing based upon my client, Mr. Ayala's, understanding of a written Spanish-English consent form. What was the erroneous view of the record that you think matters here? In this case, Your Honor, and it is in the excerpts of the record. There was an error about whether he was spoken to in Spanish or English at the outset. Correct. But how is that relevant to the question of whether, when he got the Spanish-written document, he read it or didn't read it? I mean, ultimately, the question turns, his ultimate position is that he's illiterate enough that he didn't understand English. His determination, Judge Hogan's threshold determination was, was consent given at all? And it was given, if at all, only through his understanding of the written consent form, which was in Spanish and English. Exactly. So why does it matter if he understood English? Because Judge Hogan found that his credibility, my client testified at the hearing, and he testified, I do not understand or read or write English. I do not read or write in Spanish. That was the only direct evidence as to whether or not my client understood the Spanish language. And Judge Hogan, acknowledging that it was a very close case, Judge Hogan said, I discredit Mr. Ayala's testimony because he responded to a request made to him in English. So it was a critical credibility determination that the district court made on the issue of consent or not. And he made that credibility determination, which was the only direct evidence on the point, based on an erroneous recollection of a testimony. That said, let me touch briefly on You're saying that Mr. Should I say Mr. Ayala or? His full name is Mr. Ayala Mercado. I have called him Mr. Ayala. Okay. Well, then he didn't respond to an English question. Correct. He was the officer testified. Testified at the suppression hearing that shortly after he initially stopped the vehicle on August 24th of 2002, that standing at the passenger side, he looked across the vehicle. He asked the driver for the registration of the vehicle and for driver's license. He asked it in English. He asked it in Spanish. The testimony is cited in the brief. The actual question was put in Spanish. Wasn't there any implication that the word registration may have been in English though? The officer testified directly that he asked the question in Spanish. But then they said something to him about how did you know what the registration. I guess the point was how did he know looking in the glove compartment, what was the registration for if he couldn't read English? Well, Judge Hogan's inference, I believe, Your Honor, was that Mr. Ayala had testified he didn't understand English or read or write it, and he didn't read or write Spanish. And that was the evidence on that question. And if he didn't read or write English, how could he know what the registration form was? He testified something about he didn't even testify. There were three things that were of concern to Judge Hogan particularly. One, that Mr. Ayala's testimony was incredible because he said he didn't understand English, and the testimony showed that he did because he responded to an English question. And that was erroneous. Number two, that he testified that it was, quote, just a lucky guess that he produced that document in response to the English question. And, again, that was a question that came from the prosecutor, from Ms. Harper, who asked, was it just a lucky guess? But if he said yes to that, doesn't that make your case hard? It doesn't. It compounds the error. There's testimony based on an erroneous assumption of the court. And it goes to the credibility of my client, who is on the stand testifying, I didn't understand what I was signing in Spanish or in English. And for that reason, I would submit, that credibility determination was the critical fact in the judge's conclusion. When he said it was a lucky guess, was the question to which he answered translated at that point? Was it just a lucky guess? That question was translated into Spanish, presumably. Of course. There was a translator in the court. So he says yes to that. Explain to me why that doesn't kind of blow his credibility. Because it was a question put to him by the prosecutor based on a false premise. The premise was you responded to an English question. Why was that the premise? Why wasn't the premise simply if somebody asks you what a registration is and you can't read or write English, how can you pick out the registration? If you don't know what it is, if you can't read or write English, how do you know it's a registration as opposed to something else? But that was, okay, he was asking Spanish. I understand he was asking Spanish, but the registration form is in English. So in order to pick up the registration form as opposed to something else, isn't it a fair inference that maybe he just knows some English? Or else he would have pulled out instead a shopping list? I think it is not fair inference, Your Honor. I think people understand that they have documents that pertain to their car and they do in Mexico as well. That's what the testimony was. You can believe it or not believe it, but I don't think it depended in any way on in what language was asked the question. In fact, if you look at what the judge said on, I guess, 219, he really did not rely, when he got to the credibility determination, on the language in which the question was asked. He was focusing on whether he read English or Spanish, not what language he spoke. He actually said on page 219 of the excerpts, although Ayala Mercado testified that he could not read the form. Read the form. It didn't say anything about what language he was speaking. Well, his responses and demeanor convinced the Court he's not credible. His testimony that he just got lucky in producing his registration upon Costanza's request. But I think Judge Berzon's point is that he's not talking about the question. He's talking about the language on the form, that unless he could read English, he wouldn't know what to hand the police officer. I think that's a fair reading of what the district court has said. The context of the examination, however, Your Honor, if I can find the... I know where it is, and I know that there's a difference of whether the question is asked in Spanish or English, but I think the question that Judge Berzon has properly raised here is, what is the district judge focusing on? And he says he's talking about the form. He could not read the form. And that's what his credibility. And then part two of his credibility is the Washington State identification card. And he's asked how he got that filled out. And he said, by trial and error. And the judge says, that's just incredible. So I see your argument, but I'm not sure that maybe the district judge should have been clearer on these findings, but given the benefit that he's doing it probably off from the bench, which I assume he isn't. He actually did not. He reserved and filed it with an order. He normally does, but he didn't in this case. Then that even further indicates that read the form may be significant. I don't know what you're thinking. My thinking, Your Honor, is that I believe that that was the basis for his conclusion, but the point remains that this was the government's burden here. Well, it's not. I mean, if you were arguing that these aren't the strongest reasons, I would have somewhat more sympathy for it, because it does seem to me. Well, I argue that, too. It does seem to me that Jess got lucky in producing this registration from reading exactly what you said, which is, well, he knew they were looking for something having to do with the car, so he pulled out something having to do with the car. Similarly, with respect to the trial and error comment, he explained what he meant by that, which is that he sort of memorized things. Correct. But neither of those really – but then we really are in a clear error world, and we are not talking about a judge who was basing something on an erroneous fact or just disagreeing with his assessment. Well, passing to that point, I see that I want to reserve Mr. Stone's time. You've gone beyond where you wanted to stop. I know that. So I'd suggest you answer Judge Berzon's question, and we'll give your colleague an extra half a minute if he needs it. Thank you. Passing to the question of clear error or not, the district court concluded that the government had met their burden of showing clear and unequivocal consent based on testimony that my client held a document in his hand which was written in Spanish, that his eyes scanned it, and that he held it for a period of time which, in the judgment of the officers, was sufficient to read the document. Apart from my client's testimony, that was the only evidence of consent. And reading the document was critical to consent because it was in that document that it was stated my client had the right to refuse the consent and the other factors that the court considered. Now, obviously, you didn't have to have that advice. I'm not taking that position. But the court relied on the fact, on the content of the document, to support the finding of consent. And the only evidence that it was read was the scanning of the eyes and the length of time it was held by the woman. Thank you, sir. Thirty seconds. Very good. Now, Mr. Stone was gracious to say he would only take eight minutes, and he's only got six and 40 seconds. But we'll add you can go a minute and a half more. Thank you, Your Honor. Hey, police court. I'm Robert Stone. I represent Defendant 1, Carlos Torres Espinosa. The district court found that the government had failed to meet their burden of proof with regard to my client, Mr. Torres Espinosa, with regard to his consent to search. The government has not tested that finding. The result is that we're left only with Mr. Ayala Mercado's consent. And I would incorporate Mr. Nixon's arguments with regard to Mr. Ayala Mercado's consent. And I believe there are other factual errors. Where was that finding in the district court's opinion that there had been a failure of the showing, as far as your client is concerned? That is Mr. Torres Espinosa's. Excerpt from records, page 174, says, Here the government has met this burden with respect to Ayala Mercado, but not with respect to Torres Espinosa. On what issue? That was whether there was authority to consent. Authority to consent? Yes. The court held that the driver of the car had authority of consent, so they're properly in there. Yes. If they're in the car and they're properly in there, does your client have an argument as to what they found? Well, the answer to that, Your Honor, is that I don't believe that issue is before the court. Okay. There was no argument by the government at hearing or on appeal. And this is not a standing issue. And I would point out U.S. versus Juan, which is a 1989 circuit case that said in exactly the same circumstances, where three passengers attempted to contest the search of a vehicle. The issue of whether they had standing to even be in the appeal was not argued at the government at the hearing, at the suppression hearing, nor was it argued on appeal. But if the government had a valid consent from Ayala to search the car, I'm not saying they did, but assuming we decide that, then why do they they don't need more than one consent to it? Well, they may not have needed it, but they presented evidence at the hearing. And they presented the consent form to Mr. Torres Espinosa, got him to get his signature on the consent form and presented that. Let's assume let's assume that the Ayala consent is OK, is valid, but that the Torres Espinosa consent isn't. Why isn't that a so what as far as as far as the search of the trunk is concerned? Because it would seem that that if if Ayala made a valid consent, he's got authority to consent. I think that's probably correct. If Mr. Ayala and Mercado's consent is valid, then the search comes in. So basically, you're just piggybacking here. Yes. But you have another issue on the statements made by your client, as I understand it, that he may have made before he got Miranda warnings, right? Yes, sir. Officer Foreman testified that after he removed Mr. Torres Espinosa from the car, removed him to the side of the road, he questioned him with regard to his relationship to the driver, Mr. Ayala Mercado, and that he got inconsistent statements, which he then he testified, this officer Foreman, the second officer on the scene testified that he relayed those concerns to Tupper Costanza, who then ultimately testified at one point that he relied upon officer Foreman's information in deciding that they were going to search the car. The court never included that particular circumstance in its findings in support of the consent or of the reasonable suspicion. So you're really not contesting the introduction or possible introduction of any statements? You're only interested in the Miranda warnings because one of the listed elements, somewhat mysteriously, with regard to consent is whether there were Miranda warnings at the requisite time. Is that right? I'm not sure that I understood. Are you contesting the introduction of any statements? Well, were this case to go back on remand and the court were to be directed to look at the record to find support reasons for its findings, then my position would be that Mr. Torres Espinosa, having been in custody, having been required to have been given Miranda warnings and not having been given those statements that he made, that Officer Foreman testified that he got from him and relayed to Tupper Costanza, who ultimately made the decision and who also testified that he relied upon those, that those should not be, that the district should not be. With regards to what decision? The decision to give consent to search the car or to search the car, which was what Tupper Costanza said. They got consent to search the car, they got consent to search the car. What does the rest of this matter for? If Torres Espinosa's consent doesn't matter, which we already established earlier, because Ayala's consent alone is good enough, then what is the relevance of any of this? Well, I would submit that it's relevant, if not to the consent, to the argument that if there was consent, and even if it was voluntary, that that consent was tainted by the prolonged detention. And one of the reasons that Tupper Costanza, well, the court found that there was reasonable suspicion, and the finding, the court did not include in its findings the fact that Officer Foreman testified that he told Tupper Costanza that he had gotten inconsistent statements. There were other findings by the court on the issue of reasonable suspicion and on the issue of whether- Well, and it's not my strongest argument, and I probably spend too much time on it. But I think if it goes back on remand, then I think that those issues should not be before the court. Those statements made by Mr. Torres Espinosa, the court should not be allowed to rely on those because the statements were made without Miranda warning. I understand that. I think there are a couple of other, just briefly, a couple of other factual errors that the court made, both with regard to its finding that Tupper Costanza had reasonable suspicion to prolong the Terry stop, and then that in prolonging it, that he diligently pursued his investigation. The court made a couple of findings, or several findings, with regard to the reasonable suspicion. One of them, one of the court's findings was that Tupper had reasonable suspicion to prolong the detention because defendants were traveling on a known drug smuggling corridor, the I-5 route, and that appears nowhere in any officer's testimony. Tupper Costanza also, and the court also relied upon the trooper's testimony that the airbag had been removed from the steering wheel. And it was Costanza's testimony that that was true. He saw that. But his direct testimony at that time was that that made sense to him because he had the registration for the vehicle, and it was a salvaged vehicle. And his testimony was that it's not uncommon for a salvaged vehicle to have the airbag removed. So if not removing that from consideration, it certainly goes to the weight of the trooper's reliance on that particular circumstance. Tupper Costanza also initially testified. Are you arguing that there was no reasonable suspicion to begin with, or exactly what? I'm arguing that the court, Judge Hogan said that this was a close case. He said it was a close case all the way around. Well, the closest about it was how long they were there, but whether they had reasonable suspicion of stopping them for a little while doesn't seem too difficult. The question is why they were able to keep them there for an hour. Well, and I would submit to the court that Judge Hogan made factual errors in what he considered as reasonable suspicions. So if we remove those and there's still reasonable suspicion, then there's still reasonable suspicion. And the oranges and the cologne and the air spray and all that, and the fact that that wasn't their car and so on isn't enough by itself. I believe what this boils down to, if you remove those things that I think were erroneously relied upon by the court, were that you have the driver and passenger with ID cards from different states, the vehicle registered to a third party, and common items that can be used, and the trooper testified in his training and experience that they may be used to mask the odor of drugs. And four of the circumstances that the court relied upon were different masking odors. And I would argue that that can be fairly characterized as common items that can be used as masking odors or illegal drugs. So whether those three circumstances are reasonable suspicion is obviously for Your Honors to decide. But I would suggest that at least it needs to be considered because the court included other things when it found that there was reasonable suspicion that were not, that were in error. I'm sorry. I'm way over time. Thank you. I think we've gone beyond our limit. But we appreciate the argument. Judith Harper representing the government, Your Honors. This court should uphold Judge Hogan's ruling that the motion to suppress in this case should be denied. Basically, the officers stopped this car and had a legal basis to stop the car. Within 15 minutes of that stop, these officers had reasonable suspicion to expand the scope, expand the scope of the stop. And then the officers did, through various efforts and means that took up some time, did get voluntary consent from Defendant Isla Mercado. What strikes me is that the time was taken up because essentially the police weren't prepared. The police didn't have a Spanish-language consent form. They didn't have any way to deal with getting the dogs. They had to call several different people and then they weren't available. They didn't have a Spanish-speaking officer available on less than 45 minutes' notice. And that's why it took that long. So how do we factor that in? What's adequate diligence? Two things come to my mind. I think within half an hour, Trooper Costanzo had Defendant Isla Mercado's consent written in English. And so he knew at some level, there is some understanding in his mind, that the defendant was agreeing to a search. He testified that, and in the record, that he saw the evidence. But he didn't search. He kept him there for another 20 minutes. He was wanting to verify through means that were not readily available. So I'm coming back to what I said. He wasn't prepared. That's true. He didn't have ways to verify that consent was valid. I think he believed he had a degree of consent, but he was concerned and wanting to make sure that the language with the language barrier issues, that there was no misunderstanding. And I think that's why he and the other officers were diligently working to make sure that I suppose there was no Spanish language. Suppose they didn't have the Spanish language form at all and he had to go three hours to find it. Then would that be okay? I think as long as the officers are, as in the case that I think several of us talked about, Gallegos v. City of Los Angeles, the standard was that there's no rigid time frame, is what that case said, between the stop and a de facto arrest. So we have to look at all the surrounding circumstances to determine whether the police were acting reasonably to dispel the suspicion. But is one of the surrounding circumstances that a police mission, at least in the West Coast, should be wandering around with Spanish language consent forms instead of having to take 45 minutes to get them? In an ideal world, yes. That would be what would be necessary. But here, because they had consent in English, they were working to verify that, either with a drug dog, either with a Spanish-speaking officer, or with the Spanish consent form. And I think as long as they're working diligently to verify that consent that they already had, then the... Well, they obviously weren't willing to rely on it, and it's a good thing, too, because they probably wouldn't have succeeded. They wanted to make sure. I think they were concerned. I think the record indicates, though, that the troopers testified that it appeared that the defendant, Mr. Alamacata, was reading the English consent form, that his eyes were scanning that document, too. But he was concerned because of the language barrier that he wanted to make sure. And he didn't keep him out on the freeway for days. It took, what, 59 minutes, I think, for us to get the Spanish consent form there. And in an ideal world, he would have some in his car. But he was, as the court was saying the standard was in Gallegos, working diligently to make sure that the consent... I guess my question is this. From the point of view of the circumstances that the officers face at the moment that they're confronted with it, in which case I might agree that this was diligence. Or do we require some planning so that you're not having citizens sit around for an hour at a time because the police just don't have any systems in place? Isn't that really the question here? I don't think that the diligence applies to where the officers start out. In an ideal world, Trooper Costanzo, I think he testified, he was in a vehicle that was not normally his own where he would have his Spanish consent forms. And so in an ideal world, we would have had that diligent activity where he had his Spanish consent forms right there. But having not had that, I don't think the case law is requiring that diligence up front. I think the case law is saying, before we get to an illegal arrest situation, we have to show that the officers weren't diligently working to dispel suspicion. And that's what they were doing in many ways here, trying to get the drug doc. Certainly if a drug doc had been available and alerted, we would be able to search the car. What would the police, stopping police officers, what is their responsibility? Were they highway patrolmen? Were they DDA? What were they? They were Oregon State Police highway patrolmen. And these people are going 85 and a 65, so a highway patrolman pulls them over. Correct. And then it's after that that we find out that there's some reasonable suspicion. Right. The officer's sort of, his antenna goes off because of what we talked about or what the court talked about before, the cologne smell and the oranges and the fact that both defendants were from different places and that they were, the car was registered to a third party. So yes, he's a highway patrolman. He wasn't a DDA agent. I didn't really know he was going to confess. How does the government deal with the fact that the district judge in assessing voluntariness, on one of the voluntariness factors, looked at custody. And I think he said they were not free to go. So for purposes of whether Ayala's consent was voluntary, he considered him in custody. But it seems that he didn't consider him in, consider Pines Espinosa in custody for purposes of whether Miranda warnings had to precede his statement. Now, is that error? If it's error, is it harmless? Does it matter? Are there different standards for what's custody for purposes of a voluntariness factor assessment and what's custody for purposes of Miranda? It would seem to me that the law most likely, although I haven't really looked at this in detail, but it most likely is that if you don't feel free to go, you're in custody on both grounds. Well, I think Judge Hogan's viewpoint was, with respect to custody, with respect to Torres Espinosa, was that he expected custody in that circumstance to be a situation where there's a formal arrest. There's some formality, and custody would kick in when there's some... Right, so he's looking at custody like you're arrested, you're in the police station. Right, right. For purposes of Miranda, but for purposes of his voluntariness, of the consent, he's saying they were in custody. So, I mean, I realize that's what he did. I'm trying to figure out what we should do. I see. I mean, is that right? That seems sort of weird, to be honest with you. I hadn't thought about that. It seems to me that these defendants, you know, as I argued at the motion to suppress them, they were walking around, they were allowed to... Well, essentially they were Terry detained, but they weren't under arrest, right? I'm sorry, they were what? They were Terry detained, but they weren't under arrest. That's correct. And the question Judge Gould's asking is, is Terry detained custody relevant to consent or not? And I actually think there may be some case law that it is, but I'm not sure. I don't know that. So they're Terry detained custody, they're not free to go, it's relevant maybe as one factor on voluntariness, but it doesn't yet invoke Miranda, is that? I think so, and Miranda is just one factor, I guess. Is there a case that says that? Not that I'm aware of. There's another way to assess it is, well, I guess there are a lot of ways to assess it. I won't think about it. Go ahead. I just was thinking Miranda, whether or not there's custody, I guess my perspective is Miranda, whether or not there's custody, is a factor to be assessed in voluntariness, and whether there's custody or not isn't necessary. Why, by the way? Why? I've never understood why. Why Miranda? Yes, because when you tell people Miranda, you're not telling them anything about consenting to search, so I don't understand why. Well, because they can just say, I'm going to retain my right to remain silent, and that's it. That's it. It's one of the factors that are key. I don't think it's a factor, I just don't know why. Right. I think it makes people feel good that someone is told they don't have to say anything right now. You can say, police officer, go away, and I don't know that. I think the fact that you get Miranda warnings makes you less likely to. That's one thing I never understood, whether it makes you less likely to have consented or more likely to have consented, or is the notion that when you have Miranda warnings, you're seriously under investigation, and so your consent is more suspicious. I think we all think that, well, maybe that if we're told Miranda, and you know that you have the right to remain silent, wouldn't you just jump on it and make the right to remain silent? Well, let's assume for a minute that there's a Miranda violation with Mr. Torres-Espinosa. Okay. Is there anything that he said that becomes relevant to undo or to taint the search if Ayala's consent was not involuntary? No. The Durkee case that was cited by the court talks about the fact that if a third party who's in control and custody of a vehicle gives consent to search, that's all the court needs, and if that person voluntarily consents to search, that would be sufficient and valid, and we know from the record that Ayala Mercado was the driver. He was the one who was in possession of the keys. He was the one who was in control of the vehicle for all intents and purposes, so his consent is what Judge Hogan focused on and is all what we would need to show in the case, and the only thing about what happened to Mr. Ayala Mercado out there on the street, the way that factors in I think is just as to the overall rapport and the overall atmosphere that was going on there in the case. Do you want to briefly address why the district judge did not clearly err with regard to the determination that the Spanish language consent was good enough? I guess I have a prior question, and I don't know the answer to this. Is it usual to have people consent by just reading with absolutely no, with them not reading it to the officers and the officers not reading it to them orally? It would certainly be a whole lot better if you were trying to find out if they understood Spanish to let them read it. It was nice in this case and helpful that Judge Hogan found, as the facts supported, that after Trooper Costanzo handed Mr. Ayala Mercado the consent form in Spanish and observed him appear to read the document, Trooper Costanzo, in his limited Spanish, said comprende, and the defendant responded yes, and Trooper Costanzo testified that in his understanding, that was the defendant acknowledging that he understood. But there is case law upholding this kind of a procedure where nobody reads it to anybody? I don't know. I think that it has to be just an overall analysis for the trial court to decide, looking at all the surrounding factors, and for this court to see if it was clearly erroneous, whether or not there was consent, whether or not there was understanding. It's really making a lot of work for us that could have been eliminated. That's true. But looking at the surrounding factors and all that we had on the record, it appeared from the troopers and the judge that the defendant read the statement, signing his name, which had some indication of literacy, according to Judge Hogan, and answered the question when the trooper asked him if he could understand it. And all those things together showed Judge Hogan that the defendant understood. It got Judge Hogan past the first hurdle of whether there was consent at all and on to the next hurdle of whether there was voluntary consent. And the small mistake in the ruling that the defendant was asked for his license and registration in English when it was really done in Spanish, I think doesn't show that Judge Hogan's findings with respect to this issue were clearly erroneous. Judge Hogan's findings first said that the defendant wasn't so illiterate that he couldn't sign his name at the bottom of the document. It's supported in the record, independent from a credibility decision of the defendant. I think the troopers both testified that the defendant signed it. There was no doubt in the record that the defendant signed it. And then the second part of Judge Hogan's reasoning as to why there was consent, that the defendant responded yes to comprende, was supported in the record by two troopers who heard the defendant say that. And the defendant, when asked, either by his lawyer or by me, said, I don't remember or I don't know. So Judge Hogan's record, that the consent is valid, is based on factual findings that were in the record and not on any clear error. Thank you. Thank you. The case will be submitted, and we appreciate the argument at all. Now, you look very disappointed, so you went way over your time. If you want one minute, go ahead. But don't use it all if you don't need it. Thank you, Your Honor. I would briefly like to make two points. I think this goes back to first principles. The Fourth Amendment protects against unreasonable searches and seizures, and that means coercion, whether it is express, officers at your door with a gun breaking in, or implicit. And in this case, it's our position that the delay, the fact that these officers were unprepared and were, to call it like it is, stalling, that that is implicit coercion which the Fourth Amendment does not allow. And it amounts to consent by attrition. It was clear no one was going anywhere until they were in that car, be it by a drug dog or by consent. With regard to the Fifth Amendment issue of the voluntariness of consent, Judge Verzon asked if there are cases that say you don't have to explain the import of the consent. I would submit that the cases that deal with that issue are a shibu, and the cases that talk about the burden of the government to demonstrate that the consent is clear and unequivocal. And if, under the circumstances of the case, that requires an explanation by someone who speaks the same language as the individual you are involved with, then that is what is required. I think that is the situation here, given the state of the evidence. Thank you for your time. Thank you very much. We appreciate the argument. The case will be submitted. We're adjourning. I guess we're back at 2 for another slightly different panel. All rise. This session is being adjourned. Thank you. Thank you, sir. No problem. I just didn't know you were going to be here. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. Yeah, there's one here on the floor. It's just right beneath me. That's all. All right. I'll do it if I must. Pardon? I'll do it if I must. No. Okay. I'm just going to get the judge. I think maybe this is enough for this afternoon. All right. Thanks. All right. This is about time. 2 o'clock. 2 o'clock.  2 o'clock. 2 o'clock. 2 o'clock. 2 o'clock. All right. I'll get it. All right. Thank you. Thank you. Okay. Okay. Okay.
judges: Wallace, Gould, Berzon